## IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

Antonio "Tony" Moreno, Jr.                   )
359 Hartman Dr.                              )
Severn Park, MD 21146                        )
                                             )
Glendora Meyers                              )
3352 Alden Pl. NE                            )
Washington, DC 20019                         )
                                             )
            PLAINTIFFS                        )
                                             )
                                             )
                                             )
     vs.                                     )
                                             )
                                             ) **COMPLAINT FOR DAMAGES,**
                                             ) **INJUNCTIVE RELIEF, SPECIAL RELIEF**
District of Columbia                         ) **AND PUNITIVE DAMAGES**
                                             )
Serve: Mayor Muriel Bowser                   ) **JURY TRIAL DEMANDED**
1350 Pennsylvania Ave, NW                    )
Washington, DC 20001                         )
                                             )
                                             )
Dr. John M. Thompson                         )
Address currently unknown                    )
                                             )
Camile Williams                              )
Address currently unknown                    )

DEFENDANTS
_____

## Introduction

1. Plaintiffs bring this action against the District of Columbia, as well as Dr. John M.

   Thompson and Camile Williams in their individual capacities, based on violations of

   the Age Discrimination in Employment Act ("ADEA"), 29 USC § 621 *et seq*. and the

   District of Columbia Human Rights Act, DC Code § 2-1401 *et seq*.

2. The District of Columbia Office on Aging ("Agency"),  Dr. John M. Thompson, and Ms. Camile Williams engaged in a pattern of age discrimination against their employees, and retaliated against persons who raised objections.

3. If Defendants were unable to force the elderly employee to quit, then, they ultimately built false cases to demote or terminate them.

**Parties**

4.  Antonio "Tony" Moreno, Jr. is, and was at all times relevant to this action, a resident of the District of Columbia.

5. Glendora Meyers is, and was at all times relevant to this action, a resident of the District of Columbia.

6.  Defendant District of Columbia is a municipal corporation, and an employer as defined by 29 U.S.C. § 203 (d).

7. The Office on Aging (hereafter "The Office") is a subunit of the District of Columbia and is located at 500 K Street, NE, Washington, D.C. 20002.

8.  Defendant John M. Thompson was at all times relevant to this action, Director of the District of Columbia Office on Aging.

9.  Defendant Camile Williams was at all times relevant to this action, Chief of Staff for Dr. Thompson at the District of Columbia Office on Aging.

## Jurisdiction and venue

10. Jurisdiction and venue are proper in this District under Federal Question
jurisdiction.

## Vicarious Liability Allegations

11. Under the doctrine of *Respondeat Superior*, an employer is liable for the actions of an
employee or agent conducted within the course of their employment.

12. All of the relevant actions by the Defendants were conducted during their regular
time as employees of the District and within the scope of their employment.

## Factual Allegations

### I. Allegations generally applicable to all Plaintiffs

13. In or about January or February of 2011, Dr. John M. Thompson returned to the
Office as Executive Director.

14. In or about March of 2011, Camile Williams was made Chief of Staff.

15.  All Plaintiffs quickly learned that Dr. Thompson and Ms. Williams would, if an older
employee fell out of their good graces, engage in a pattern of behavior to sabotage
their employment at the Agency by giving said older employee impossible work
requirements and deadlines, and treating the employee terribly until they resigned.

16. If Dr. Thompson and Ms. Williams were unable to get the elderly employee to resign by creating an intolerable work environment, they would fire or demote them either without cause or on trumped-up, meritless charges.

17. In February or March of 2012, everyone at the Office was required to go to a mediation run by the District of Columbia Office of Human Rights due to disregard of District of Columbia laws by Dr. Thompson and Ms. Williams.

18. In early 2013, during a staff meeting for new social workers attended by Plaintiffs and other elderly employees of the Agency, Dr. Thompson told the older employees that "just because you work for the Office on Aging, doesn't mean that you will age here." When he said those words, he looked specifically and directly at a group of older employees.

19. In November or December of 2013, during a meeting of the Commission on Aging where he was introducing younger, new employees, Dr. Thompson stated that "I brought these young guys here because they are part of my new team. And as I said before, we need to infuse new blood in the agency."

20. In 2014, Dr. Thompson and Ms. Williams received a string of age discrimination complaints from employees of the Agency. Defendants did not take the claims seriously nor examine if the Office may have had a pattern of discrimination or other prohibited personal practices.

21. There was a common belief among the elderly employees at the Agency that Dr. Thompson and Ms. Williams were on a mission to get rid of the older employees at the Agency and replace them with younger, less-qualified but more loyal individuals. They believed younger employees could be molded and/or manipulated more easily.

**II. Plaintiff Antonio "Tony" Moreno, Jr.**

22. Born on December 7, 1951, Mr. Antonio "Tony" Moreno, Jr. was hired in July of 2012.

23. Mr. Moreno was interviewed and hired to be a Strategic Planner for the Agency, a Management Supervisory Service ("MSS") managerial position.

24. During his tenure as Strategic Planner, Mr. Moreno created and developed the Agency's strategic plan and was given the opportunity to work on special projects and programs with the Executive Director.

25. Under Mr. Moreno's guidance, each of the programs he developed were successful and sustaining.

26. Mr. Moreno's role also included fostering new and supporting existing partnerships with other organizations and companies in an effort to support the missions and goals of the Agency.

27. Mr. Moreno's direct supervisor was Chief of Staff Ms. Camille Williams.

28. Although Mr. Moreno reported directly to Ms. Williams, he received most of his direction from Executive Director Dr. John Thompson.

29. Early in 2013, during Mr. Moreno's first six-month performance evaluation, Ms. Williams informed Mr. Moreno that he was doing an extremely good job.

30. Based on this positive performance evaluation, Ms. Williams told Mr. Moreno that he would be getting a management position supervising the Agency's External Affairs team as the Manager of External Affairs and Communication.

31. In a closed-door meeting in which Dr. Thompson, Dr. Teasdell, and Ms. Williams were present, Mr. Moreno was formally informed that he would be selected as the External Affairs team's manager.

32. Also during this meeting, Ms. Williams also stated that she wanted to terminate three older employees – Ms. Darlene Nowlin (49), Mr. Courtney Williams, (59), and Ms. Yolanda Lyles, (45) - who would have reported to Mr. Moreno before he assumed this new role.

33. Believing that these three employees were outdated and having outlived their usefulness, Ms. Williams said she would terminate them through a re-organization of the Agency, whereby these individuals' job descriptions would be eliminated.

34. Dr. Thompson supported all of this.

35. Mr. Moreno later learned from Ms. Williams after their meeting that the Agency had
    been told by D.C. government attorneys that there were not enough positions being
    eliminated to warrant a re-organization and that such a move was likely unlawful
    and would be seen as pre-textual.

36. Ms. Williams then decided that she would see to it that Ms. Nowlin, Mr. Williams and
    Ms. Lyles would be demoted or fired by manufacturing "performance-based"
    reasons instead.

37. In or around April of 2013, Mr. Moreno was informed by Ms. Williams that the
    Agency was moving him into the management services (MSS).  According to Ms.
    Williams, Ms. Glendora Meyers was instructed to post the job for the minimum time
    and then the position would be Mr. Moreno's.

38. At this time, Ms. Williams also re-affirmed to Mr. Moreno her desire to get rid of Ms.
    Nowlin, Mr. Williams, and Ms. Lyles.

39. On multiple occasions, Mr. Moreno would defend the work and performance of Ms.
    Nowlin, Mr. Williams, and Ms. Lyles, stating that there was no basis to terminate any
    of these employees.

40. This did not move Ms. Williams, and the fact that the three employees were old and
    outdated was enough for her to get rid of them and replace them with younger
    persons that she believed she could more easily mold and manipulate.

41. In June of 2013, Mr. Moreno assumed the role of Manager of External Affairs and Communication for the Agency, supervising five employees including Ms. Nowlin, Mr. Williams, and Ms. Lyles.

42. Upon Mr. Moreno assuming the External Affairs manager role, Mr. Moreno was instructed by Ms. Williams to write up the three at every opportunity and that he should document everything, so "he would be covered."

43. By way of example of the meticulous level of documentation she expected, Ms. Williams told Mr. Moreno that she had every email she ever sent since working in the mayor's office.

44. At the time, Mr. Moreno, a newly-appointed manager having only worked with the District for less than a year, did not know the regulations in place for reprimanding employees and relied upon and followed the lead of the Chief of Staff, who he believed to have the District's best interest at heart.

45. Instead, Ms. Williams only used and manipulated Mr. Moreno's newness to the position and the Agency in order to force him into complying to an illegal directive.

46. Ms. Williams further instructed that if Mr. Moreno did not write the older employees up, she would "find someone that would."

47. Not wanting to appear insubordinate and fearing that his job was at stake, Mr. Moreno did as he was told, and by October Ms. Williams had requested that each of the older employees be placed on a Performance Improvement Program ("PIP").

48. Mr. Moreno was also instructed to complete the three employees' performance evaluations for the entire year, even though Ms. Nowlin, Mr. Williams, and Ms. Lyles only reported to him for three months of the year.  Ms. Camile Williams further instructed Mr. Moreno to give them all low marks.

49. At that time, Mr. Moreno told Ms. Williams that District policy stated that he could only grade Ms. Nowlin, Mr. Williams, and Ms. Lyles during the time they reported to him.

50. Furthermore, Mr. Moreno expressed his concern that Ms. Williams was unfairly targeting these three employees because of their age.

51. Nevertheless, Ms. Williams demanded Mr. Moreno's compliance.

52. However, after raising the issue of the Agency and Ms. Williams willfully violating Federal and DC age discrimination laws, Mr. Moreno found himself out of Ms. Williams' and Dr. Thompson's good graces. Ms. Williams believed that he, like the employees he was directed to discipline, was old and had an outdated way of thinking.

53.  Soon after, Dr. Thompson and Ms. Williams began taking steps to sabotage Mr. Moreno's employment in an effort to retaliate against Mr. Moreno and force Mr. Moreno out of the Agency, under the belief that he needed to be replaced with someone who was younger, easier to mold and manipulate, and ultimately more loyal to them.

54. Dr. Thompson and Ms. Williams, on more than a few occasions, stated during meetings and other times that they wanted to infuse "new blood" in the Agency.

55. In an effort to accomplish this, in or around the middle of October 2013, Darrell Jackson, Jr. was hired by Dr. John Thompson and Ms. Williams as a Community Outreach Specialist.

56. Mr. Jackson was a 32-year-old man.

57. Mr. Jackson would go on to assist the Executive Director with television and radio outreach and was to report directly to the Chief of Staff, and be supported by Mr. Moreno and his External Affairs Office.

58. Shortly after Mr. Jackson was hired, Ms. Williams ramped up her efforts to get rid of the elderly Mr. Moreno, using young and newly-hired Darrell Jackson as her point person.

59. Under Ms. Williams' orders, Mr. Jackson began to demand that Mr. Moreno's staff complete certain tasks for Mr. Jackson without first coming through Mr. Moreno,

even though Mr. Moreno was the supervisor of the External Affairs Office and was Mr. Jackson's boss.

60. Upon being questioned by Mr. Moreno as to under what authority Mr. Jackson was operating under, Mr. Jackson informed Mr. Moreno that the Chief of Staff had given him the authority to act independently of Mr. Moreno.

61. Shortly after having his authority usurped by Mr. Jackson under Ms. Williams' authority, Ms. Williams began refusing to have meetings with Mr. Moreno.

62. Ms. Williams also began to demand delivery of projects and assignments from Mr. Moreno at an unreasonable rate, and regardless of the speed and quality of the project, everything that Mr. Moreno began to present was criticized and deemed unacceptable.

63. Despite Ms. Williams' hostile treatment, during his time at the Agency, Mr. Moreno never missed a deadline.

64. After spending the remaining of 2013 and the beginning of 2014 establishing a false case to terminate Mr. Moreno, Mr. Moreno was terminated without stated cause on November 18, 2013.

65. Shortly after Mr. Moreno's termination in November of 2013, Dr. Thompson and Ms. Williams demoted Darlene Nowlin, one of the employees Mr. Moreno refused to fire.

66. They also promoted Darrell Jackson, Jr. to Mr. Moreno's former position of Manager of the External Affairs Department before making Mr. Jackson Director of Communications in April of 2014.

67. Prior to Mr. Jackson coming to the Agency, Executive Director Thompson, accompanied by a stellar recommendation by Chief of Staff Williams, had recommended Mr. Moreno to join Dr. Thompson in attending a Certified Public Managers course and pushed a request through for the DC government to pay for Mr. Moreno's tuition.

68. Upon Mr. Jackson's hiring, this opportunity was taken away, because defendants preferred to give the opportunity to younger employees.

69. At the time of his termination, Mr. Moreno was 62 years old.

**III. Plaintiff Glendora Meyers**

70. Born April 15, 1953, Glendora Meyers was hired by the Office on Aging on August 27, 2012.

71. Ms. Meyers was initially hired as a Management Liaison Specialist at the Agency.

72. In or around March of 2013, she was later promoted to Administrative Officer, MS-14, working within the General Services Division.

73. Included among Ms. Meyers' job responsibilities was managing HR for the Agency.

74. Prior to her promotion to Administrative Officer, however, Ms. Meyers was performing the duties of both the Management Liaison Specialist and Administrative Officer.

75. Throughout her time with the Agency, Ms. Meyers received good performance reviews.

76. During her time and given her position at the Agency, Ms. Meyers both experienced and witnessed numerous instances of age discrimination. These instances include, but are certainly not limited to, the following examples:

77. In or around December of 2013, Ms. Meyers, along with elderly Plaintiff Mr. Moreno, requested to take the District's Certified Public Manager Program, a program designed to enhance the skills of the District's government's managers and provide them with the tools to be more effective leaders.

78. In order to be eligible for the program, however, a District Mmanager must, among other criteria, have the endorsement of their agency head to participate in the program.

79. Camile Williams, the Office on Aging's Chief of Staff, acting on the behest of the Agency's head, Executive Director John M. Thompson, served as point person for this program.

80. When Ms. Meyers asked Ms. Williams for her endorsement to participate in this

program, Ms. Williams told Ms. Meyers that she had no interest in endorsing the

"older" employees and only wanted the "younger" employees to participate.  An

email memorializing this sentiment was sent to around to all managers.

81. Ms. Williams then followed through with her stated course of ignoring older

workers and endorsed Mr. Darrell Jackson, Jr., a 32-year-old employee at the time.

82. Between December of 2013 and February of 2014, Ms. Meyers discovered that Ms.

Williams wrote in correspondence to another Office on Aging employee, ADRC

Manager Dr. Chantelle Teasdell, that Ms. Williams was specifically targeting younger

employees for training and advancement opportunities.

83. In or around December of 2013, Ms. Meyers complained to Ms. Williams about how

poorly the older employees at the Agency were being treated in comparison to their

younger counterparts.

84. This mistreatment took a variety of forms, including, but not limited to, limiting and

segregating older employees in a way to deprive them of training and employment

opportunities, verbally ridiculing and abusing older employees as a method of

intimidation, and otherwise creating a hostile work environment for the Office on

Aging's elderly employees.

85. Managers were further instructed to give older employees lower performance ratings, while younger employees were not held to the same standard.

86. Ms. Williams, in particular, directed managers to give lower scores to elderly persons. She also was a key culprit in the ridiculing, talking down, and otherwise threatening of older employees.

87. Ms. Meyers, throughout her time at the Agency and in her role as an HR manager, also witnessed and was forced to participate in the hiring of less-qualified, younger candidates over more-qualified, older candidates.

88. Similarly, Ms. Meyers also witnessed the firing of more qualified, older employees who were replaced by less-qualified, younger people.

89. For example, when Dr. Thompson arrived at the agency, the entire executive committee at the Office was over the age of 40. Dr. Thompson and Ms. Williams systemically pushed out each employee over forty on the executive committee.

90. Ms. Meyers was only spared (at the time) because Chief of Staff Williams told her that she had nothing to worry about, because at the time, Ms. Williams "liked Glendora."

91. This all changed in 2014, after Ms. Meyers began to raise concerns about how the Agency was violating Federal and DC age discrimination laws, as well as criticizing how the older employees were being treated at the Agency.

92. At that point, Ms. Meyers found herself on Ms. Williams' and Dr. Thompson's bad sides and they decided that Ms. Meyers herself was outdated and disloyal.

93. Ms. Williams and Dr. Thompson followed the same pattern of behavior employed on Plaintiff Moreno and other elderly employees in an effort to force Ms. Meyers to resign.

94. This included, but was not limited to, creating unreasonable productivity deadlines and overwhelming amounts of work in order to create a false "performance-based" case against Ms. Meyers, such that they could create a pretense to fire her.

95. In or around July of 2014, Ms. Williams began to chastise Ms. Meyers loudly and without cause in front of her colleagues.

96. Dr. Thompson engaged in similar behavior via email.

97. Ms. Williams told other staff at the Agency not to talk to Ms. Meyers in order to further isolate her.

98. Dr. Thompson and Ms. Williams would also instruct other managers to avoid talking to, confiding in, or asking questions to Ms. Meyers, because "she didn't know what she was doing," "she was senile," and that "they couldn't trust her."

99. Dr. Thompson and Ms. Williams continued their campaign of harassment and intimidation, and they also continued to increase her workload such that there were simply not enough hours in the day for her to meet her responsibilities.

100. When Ms. Meyers' fiancé died, Defendants refused to approve any time off for Ms. Meyers. When Ms. Meyers made her request for time off, Defendants demanded the name, address and phone number for the funeral home, and also the address of Ms. Meyers' fiancé's parents. This information was not demanded from other persons who requested bereavement leave.

101. Ms. Meyers took leave against Ms. Williams' wishes, so she could attend the funeral.

102. During Ms. Meyers' bereavement leave, Ms. Williams called and texted Ms. Meyers' to demand work, even during the funeral service itself.

103. In or around August of 2014, because of the constant harassment, ridicule, and emotional abuse by Dr. Thompson and Ms. Williams and the stress induced by the extreme workload Ms. Williams placed on Ms. Meyers, such as requiring her to perform the duties of three persons, Ms. Meyers had to be sedated by a psychiatrist. The psychiatrist attributed her need for the sedation on the poisonous atmosphere at the Office on Aging.

104. In December of 2014,  Ms. Williams ordered Ms. Meyers to hire two new people to be under her purview. Ms. Meyers was not permitted, however, to make the final

decision on who to hire for her department. Other managers were allowed such discretion.

105. Rather, Ms. Williams and Dr. Thompson chose to staff the positions with unqualified or underqualified persons whom they personally knew. These individuals were under 40 who they deemed as loyal and easy to manipulate.

106. By way of example, one such person, a 32-year-old man who was hired into a high-level communications position, couldn't even use email.

107. Due to Dr. Thompson and Ms. Williams continuing and escalating harassment and age discrimination, on January 11, 2015, Ms. Meyers wrote an email to Chief of Staff Camile Williams informing Ms. Williams that she felt she was working in a hostile work environment.

108. On January 23, 2015, shortly after filing a complaint with Dr. Thompson, Ms. Williams, and Agency attorneys, Ms. Meyers was given notice of her pending termination.

109. On February 6, 2015, Ms. Meyers was terminated without stated cause.

110. At the time of her firing, Ms. Meyers was the last remaining member over 40 on the Executive Team other than Mr. Thompson.

111. Ms. Meyers was replaced by Fredline "Freddie" Lebraun, a less-qualifed woman under the age of 40.

112. Ms. Williams told Ms. Meyers that the reason behind Ms. Lebraun's hiring was because Ms. Meyers was "old" and "outdated" and that the younger Ms. Lebraun "would be the person to take HR where it needs to be."

113. At the time of her termination, Ms. Meyers was 61 years old.

**COUNT 1:  Violation of the Age Discrimination in Employment Act**

114. The ADEA, 29 USC § 621 *et seq*., promotes employment of older persons based on their ability rather than age and to prohibit arbitrary age discrimination in employment.  § 621(b).  It is therefore unlawful for an employer to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's age.  § 623 (a).

115. The ADEA also prohibits retaliation resulting from an age discrimination complaint.  *See Gomez-Perez v. Potter*, 533 U.S. 474 (2008), § 623 (d).

116. Here, Plaintiffs were terminated because the Agency, through its agents Dr. Thompson and Ms. Williams, believed Plaintiffs were outdated and they wanted to replace them with younger, fresher, and more loyal individuals.  They further wished to retaliate against them for expressing concern over the Agency's disregard for

Federal and District laws and regulations.  Using their ages as a determinative factor to discriminate or otherwise adversely affect their employment, the Agency began to systematically retaliate against Plaintiffs, building a false narrative to discharge them.

117. This flies in direct ~~contradiction~~violation of the age discrimination and retaliation provisions of the ADEA.

118. Both plaintiffs have met the requirements of 29 U.S.C. § 626 (d).

**COUNT 2:  Violation of the DC Human Rights Act**

119.  The DC Human Rights Act, DC Code §§ 2-1401 *et seq.,* was created with the intent to secure an end in the District of Columbia to discrimination for any reason other than that of individual merit, including, but not limited to, discrimination by reason of age.  § 2-1401.01.  Therefore, in DC it shall be an unlawful discriminatory practice for an employer to fail or refuse to hire, or to discharge, any individual; or otherwise to discriminate against any individual, with respect to his compensation, terms, conditions, or privileges of employment, including promotion, because of age.  § 2-1402.11(a)(1).

120. Furthermore, it is unlawful under the DC Human Rights Act to retaliate against any employee for failing to adhere to or complaining about unlawful age discrimination. To prove this, Plaintiffs must establish that he or she (1) opposed an unlawful

employment practice; (2) the employer took a materially adverse personnel action; and (3) a causal connection existed between the two.  *See, e.g., Leyden v. Am. Accreditation Healthcare Comm'n*, 2015 WL 1245976, at *2 (D.D.C. Mar. 18, 2015).

121. Here, similar to defendants' violation of the ADEA, Plaintiffs were terminated, because the Agency, through its agents Dr. Thompson and Ms. Williams, believed Plaintiffs were outdated and they wanted to replace them with a younger, fresher, and more loyal individuals.  They further wished to retaliate against Plaintiffs for opposing Ms. Williams' and Dr. Thompson's unlawful age discrimination practices. Mr. Moreno refused to falsify records and fire three older employees and was summarily retaliated against and fired.  Likewise, Ms. Meyers complained and expressed concern over the way old and elderly employees were being treated, as well as protested the discriminatory hiring and firing practices of the Agency.  Like Mr. Moreno, she too Ms. Meyers found herself retaliated against by Dr. Thompson and Ms. Williams and summarily fired.  Using Plaintiffs' ages as a determinative factor to discriminate or otherwise adversely affect their employment, the Agency, through Dr. Thompson and Ms. Williams, began to systematically build a false narrative to discharge Plaintiffs.  This is in direct violation of the age discrimination and retaliation provisions of the DC Human Rights Act.

122. Plaintiffs have exhausted their administrative remedies and have met the requirements of D.C. Code § 2-1403.16 (a).

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully pray that judgment for each violation be entered against the Defendants, jointly and severally for the following:

1. Declaratory judgment that Defendants' conduct violated the ADEA and the DC Human Rights Act;

2. Reinstatement to the same position held before the prohibited personnel action or to an equivalent position;

3. Reinstatement of employee's seniority rights;

4. Restoration of lost benefits;

5. Back pay and interest on back pay;

6. Front pay;

7. Compensatory damages;

8. Other actual damages, incidental damages, and consequential damages as will be proved at trial against each of the Defendants, jointly and severally;

9. Interest on all sums;

10. Special damages as permitted by law;

11. Punitive damages as will be proven at trial against each of the Defendants, jointly and severally;

12. Court costs, expenses and reasonable attorneys fees;

13. Any and all such other relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Respectfully submitted,


_____/s/_____
Daniel Hornal
D.C. Bar No. 1005381
Talos Law
705 4th St., NW #403
Washington, DC 20001
(202) 709-9662
Daniel@taloslaw.com

Attorney for Plaintiffs